IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 11-4M |
| | ) | |
| EMERSON BEGOLLY | ) | |

**DEFENDANT EMERSON BEGOLLY'S RESPONSE TO
THE GOVERNMENT'S APPEAL OF RELEASE ORDER AND
MOTION TO AMEND CONDITIONS OF RELEASE TO
<u>SUBSTITUTE HOME DETENTION FOR DETENTION AT RENEWAL CENTER</u>**

Defendant Emerson Begolly ("Mr. Begolly"), through his counsel, Assistant Federal Public Defender Markéta Sims, respectfully files this Response to the Government's Appeal of the Release Order, entered by United States Magistrate Judge Ervin Swearingen on January 6, 2011, and further moves the Court to amend the release order to substitute a condition of home detention for the condition of detention at the Renewal Center. In support thereof counsel states:

I.  FACTUAL BACKGROUND

1.  The Government has appealed from Magistrate Judge Swearingen's order that there are conditions, specifically detention at the Renewal Center, with a condition of

outpatient psychological counseling, that will reasonably assure Mr. Begolly's appearance and the safety of the community. The Magistrate Judge reached this ruling after an extensive combined preliminary examination and detention hearing that consumed several hours.

2.    Notably, the condition of detention at Renewal Center was **more restrictive** than the conditions originally proposed by Pretrial Services.   HT: 89.[1]   Pretrial Services recommended home detention at the home of Mr. Begolly's father.

3.    Mr. Begolly is twenty-one years old and has no prior criminal record.   Similarly, his father, Shawn Begolly, the proposed third party custodian has no prior criminal record.

4.    Furthermore, the Government introduced no evidence of any prior violent conduct of any kind.

---

[1]   References to the Hearing Transcript are denoted "HT:" followed by the page numbers.

5.   There was evidence introduced at the hearing that Mr. Begolly was diagnosed with Asperger's Disorder, a form of autism and Attention Deficit Hyperactivity Disorder, "ADHD." HT: 41.   The Government introduced **no evidence** that Mr. Begolly suffers from a major mental illness, and defense counsel has observed nothing to indicate same.

6.   Furthermore, despite repeated assertions that Mr. Begolly is "off his medication," the Government has never stated **what** medication it believes Mr. Begolly should be required to take.   In fact, Mr. Begolly was prescribed Ritalin as a child, but it did not help him.   The Government is apparently asserting that Mr. Begolly should be prescribed an antipsychotic, such as Risperdal; however, the treatment of autism spectrum disorders such as Asperger's with antipsychotics is highly experimental and controversial, due to serious side effects, including death, and, in any event should only be tried if the patient is, in fact, in danger of becoming psychotic.   Mr. Begolly is not psychotic.

7.    Contrary, to the Government's assertions, at the time of his arrest, Mr. Begolly had not been prescribed any medication.  Indeed, at the hearing Agent Christman admitted that Mr. Begolly's mother, Joan Kowalski, never identifed the medication that she thought he should be taking.  HT: 76.  To the contrary, several years ago his doctor had recommended that he **not** take such medication due to the fact that it would not help him, had serious side effects, and was addictive.

8.    Furthermore, after unsuccessfully attempting to interrogate Mr. Begolly for several hours, the arresting agents in this case attempted to have him committed to Western Pennsylvania Psychiatric Institute.  The psychiatrist declined to commit him and **did not** prescribe any medication. HT: 76.

9.    The Government's assertion that Mr. Begolly is "off his meds," is unsupported both medically and factually, and is simply designed to paint Mr. Begolly as a crazy man who should be locked up.

10.  The Government relies for its assertion that Mr. Begolly is "off his meds," on his mother, Joan Kowalski.  The Government also relies on Ms. Kowalski for its assertion that Mr. Begolly has allegedly been interested in Nazism since 2001, when Mr. Begolly was approximately ten years old, and that, at age ten, he allegedly received a telephone call from a member of a White Supremacist group.  However, Agent Christman testified that no evidence had been uncovered that Mr. Begolly was affiliated with any such group.  HT: 72.  Moreover, Ms. Kowalski asserted that her estranged husband Shawn, whom she hates, alleged "fostered" an interest in Nazism.

11.  The Government failed to introduce any evidence corroborating Shawn Begolly's alleged interest in Nazism, notwithstanding the fact that the Government searched Shawn Begolly's home and had full access to it.  The only evidence the Government was able to produce on this point was a picture of Emerson Begolly, at the approximate age of 12, wearing a German military uniform.  Pictures of Mr. Begolly in the uniform were introduced as Government Exhibits 1 and

2.    However, Agent Christman conceded on cross examination that the uniform is not a "Nazi uniform," as it does not bear a swastika.  HT: 70.  Morever, the defense proffered that the photograph was taken in connection with sale of the uniform on Ebay.  Indeed, the buyer of the uniform gave it to her son who wore it to the prom.

12.   This was the sum and substance of the scandalous canard that Emerson Begolly's father had "fostered an interest in Nazism," a canard with no basis in fact,  which has now been repeated throughout the news media.

13.   Moreover, this Court should view Ms. Kowalski's words with regard to her ex-husband with extreme caution. At the time of his arrest, Mr. Begolly was estranged from his mother and living with his father, Shawn.   HT: 53   Ms. Kowalski hates her ex-husband and was upset that her adult son, Emerson, chose to live with him.

14.   Moreover, there was evidence introduced at the hearing that Ms. Kowalski is herself under psychiatric care

and is an alcoholic.  HT: 35.    Indeed, at the time defense counsel spoke with Ms. Kowalski, a psychiatric social worker was with her.   Id.    Thus, her hearsay statements are not reliable.

15.  Even more disturbing, evidence was introduced at the hearing, that Ms. Kowalski had a prior personal relationship with the investigating agent in this case, Bradley Orsini, and the defense has since learned, that this was a romantic relationship.  HT: 59.  Agent Christman confirmed that Agent Orsini was selected for this assignment based upon his prior relationship with Ms. Kowalski, who is divorced from Mr. Begolly's father, Shawn.  HT: 60. Accordingly, it is apparent that Ms. Kowalski was motivated by a desire to curry favor with Agent Orsini and to hurt her son and his father.

16.  Ms. Kowalski's motivation to hurt her son is borne out by the appalling facts surrounding her conduct and the conduct of the agents in this case.

17.   As developed at the hearing, Agent Orsini approached Ms. Kowalski to lure her autistic son away from his father's home in New Bethlehem, Pennsylvania, by lying to him and telling him that his grandmother, with whom he is very close, was very ill and near death.   Ms. Kowalski assented to this plan. HT: 52-53.

18.   Notably, the Government admits that the agents had no warrant to arrest Mr. Begolly, nor any grounds to arrest him.   According to the testimony they merely sought to "talk" to him regarding First Amendment protected speech that they believe he posted to the internet.

19.   The agents also had secured search warrants for Ms. Kowalski's home and the home of Mr. Begolly's father, Shawn Begolly.   However, despite requests the Govenrment refused to provide either the defense or the Magistrate Judge with the affidavits in support of the search warrants, state what evidence was sought, or what crime might have being investigated.   Ms. Kowalski advised defense counsel that she

was advised by Agent Orsini that in fact, Mr. Begolly **had not committed any crime.**

20.  Thus, it appears highly likely that the search warrants were **not** supported by probable cause to believe that any crime had been committed, but were based solely on First Amendment protected speech.

21.  Indeed, at the detention hearing, the Government introduced as Government Exhibit 3, a poem, which the Government alleged supported detention.  The Government quotes an excerpt from the poem at page 8 of its Appeal, but does not quote another part of the poem, which states, "words are my bullets," indicating the poem is meant as metaphor. The entire poem can be found at HT: 30-32.  The "Kamarband," referred to in the poem, is a type of Indian jewelry, which consists of an ornate waistband.  In any case, it is self evident that Mr. Begolly's right to post the poem is protected by the First Amendment, and that political speech cannot provide a basis for detention in prison pending trial. See infra.  Moreover, the Government did not establish at the

hearing that Mr. Begolly is, in fact, even the author of this poem.  HT: 29.

22.  According to the testimony at the hearing, Agent Orsini contacted Ms. Kowalski at approximately 6:45 a.m. on January 5, 2011, and informed her that the agents had a search warrant for her residence.  As described above, they subsequently induced her to lure her son from his father's home to a Burger King, in New Bethlehem, Pennsylvania by lying to him.  HT: 52-53.

23.  Upon arrival at the Burger King, Ms. Kowalski went into the Burger King, leaving her autistic son sitting in the passenger seat of the vehicle.  HT: 55-56.  According to the testimony, Agents Orsini and Daer, then stealthily approached the vehicle wearing plain clothes, and suddenly threw open both front and rear passenger doors, surprising and startling Mr. Begolly, who, as noted, suffers from Asperger's syndrome. HT: 57-58.  Asperger's is characterized by marked impairment in social interaction, in normal situations, as well as difficulty transitioning to new situations, and heightened

sensitively to noise.  Accordingly, the decision to sneak up on Mr. Begolly and scare him had predictable results. Specifically, he was startled and frightened, and screamed out.  The Agents responded by jumping into the car with him and dragging him out of the car to the ground.  HT: 62-63. According to Agent Christman, just prior to jumping into the car, Agent Orsini drew his gun and pointed it at Mr. Begolly. HT: 62.  Mr. Begolly weighs 150 pounds.  HT: 63.

24.  According to the testimony at the preliminary hearing/detention hearing after dragging Mr. Begolly out of the car the agents allegedly noticed they had wounds to their hands, and now allege these wounds were inflicted by Mr. Begolly biting them.  HT: 75.  However, no photographic record apparently was made of the alleged bite wounds.  HT: 73.

25.  Furthermore, one of the Agents who claims to have been bitten, Agent Orsini, has previously been found by the Federal Bureau of Investigation to have repeatedly lied under

oath and is no longer permitted by the FBI to attest to the veracity of affidavits.

26. Agent Orsini's previous FBI disciplinary record was made public during the pretrial proceedings in the criminal case against Dr. Cyril Wecht and revealed a long history of disciplinary violations, including a five-day suspension without pay for signing other agents' names on evidence labels and custody forms and falsifying six FBI interview forms. Moreover, Mr. Orsini was characterized by the Newark, New Jersey FBI Office's Assistant Agent in charge as a "bully." See Pittsburgh Post Gazette, "Wecht Investigators Discipline File Opened," (July 12, 2007), attached as Exhibit 1.

27. Not surprisingly, the Government chose not to put on Agent Orsini at the preliminary hearing/detention hearing, and instead offered the testimony of Agent Michael Christman who was not even present at the time of Mr. Begolly's arrest, was unfamiliar with Agent Orsini's history of falsification of evidence, and testified that he did not participate in any

12

way in the investigation of Mr. Begolly.   Nor did he review
any reports of the investigation.  HT: 4.   His primary source
for information about the case, however, was Agent Orsini.
HT: 48.   Agent Christman testified that he was aware that
Agent Orsini had a disciplinary history.   HT: 49.


28.   Shortly following Mr. Begolly's arrest, Mr. Begolly
invoked his Miranda rights, further proof that he is not
mentally ill.   HT: 68.   The Agents failed to honor his
Miranda rights or transport him without unnecessary delay to
be presented before a United States Magistrate Judge pursuant
to Federal Rule of Criminal Procedure 5(a)(1)(A).   Instead,
the Agents drove him 40 minutes back to his mother's house in
Natrona Heights, where they proceeded to interrogate him for
several hours.   HT: 68.   Mr. Begolly repeatedly invoked his
Miranda rights.   The Agents attempted to exploit his autism
by subjecting to annoying sounds, but he remained firm in
invoking his rights.


29.   While at Ms. Kowalski's home the agents executed
their search warrant, removing computers.   Simultaneously,

13

the agents contacted Mr. Begolly's father, Shawn Begolly, and his stepmother, Tiffani Begolly and ordered them to leave their home in New Bethlehem with arms raised.   Mr. and Mrs. complied, whereupon numerous agents in SWAT gear stormed their home removing computers and Mr. Begolly's collection of firearms.   The agents then interrogated Shawn and Tiffani Begolly for several hours.

30.   During the hearing, Agent Christman purported to testify regarding statements Tiffani Begolly made to the interrogating agents, which the Government in turn relies upon those statements at page 12 of its Appeal.  HT: 45. However, Tiffani Begally denies that her statements were accurately reported.   Rather, she reports that she told the agents that she had read loose papers belonging to Mr. Begolly, not his diary, that these papers dated from ten years ago, and that they were not a diary, but fiction. Agent Christman himself admitted at the hearing that he was not familiar with exactly what Tiffani Begolly told the agents.   He further admitted that he had not spoken with the agent who interviewed Tiffani Begally and did not even know

14

the name of the agent who had interviewed Tiffani Begally.
HT: 71.   Further he conceded he did not know anything about
Ms. Begally's alleged reading of papers belonging to Mr.
Begolly.  HT: 72.

31.   The Agents then transported Mr. Begolly to Western
Pennsylvania Psychiatric Institute, where a psychiatrist
failed to commit him and did not prescribe medication. HT:
76-79.

32.   At the detention hearing, the Government sought to
rely upon statements made by Mr. Begolly's mother, Joan
Kowalski, in the petition for involuntary commitment in
Government's Exhibit 4.  See also Appeal at p. 8.  But, those
statement must be viewed with extreme caution.  Ms. Kowalski
made these statements based upon false assertions by the
agents, including Agent Orsini, with whom she had a prior
relationship, that Mr. Begolly would receive treatment.  She
had also just been informed that her son would be charged as
a result of events that took place as a direct result of her
lying to her autistic son and luring him to the Burger King.

Given that Ms. Kowalski is both mentally ill and an alcoholic, the confused and inflammatory statements in the petition made under the stress of events, and under pressure by Agent Orsini should be given no weight. HT: 36. Indeed, Western Psychiatric Institute found them insufficient to either admit Mr. Begolly or refer him to another psychiatric ward.

33. Furthermore, although Ms. Kowalski refers to web postings in the petition, the only web posting provided by the Government at the hearing was the aforementioned poem. Furthermore, Ms. Kowalski alleges in her petition that "the federal agents bore witness today to these remarks," but there was no testimony or evidence that the agents witnessed any such remarks by Mr. Begolly.  To the contrary, Mr. Begolly invoked his Miranda rights and refused to talk to the agents.

34. The Government also seeks to rely on statements Mr. Begolly allegedly made to his brother Shea, and Ms. Kowalski references such statements in the Petition. See Appeal, at

16

9.    However, these statements also should be viewed with extreme caution, as according to Agent Christman's testimony, the brother's are not close and that "Shea Begolly often taunted and teased the Defendant for his desire to be Muslim or Islamic beliefs."   HT: 21.   Shea Begolly has also struggled with a drug problem, and Emerson Begolly, has criticized him for being a drug user.   It appears that the agents have used  and bullied Shea Begolly in much the same way they bullied Mr. Begolly's mother into luring him into a situation where the agents could provoke him.

35.  Following Western Psychiatric Institute failure to either commit Mr. Begolly or to refer him to another psychiatric facility, the agents took him to the Allegheny County Jail, where, at the Government's request, he was placed in isolation cell on the mental health pod.

36.  Mr. Begolly was not brought before a United States Magistrate Judge until approximately 4:00 p.m. on January 5, 2011, approximately 17 hours after he was arrested.

37.  Defense counsel was only then appointed, and was able to see Mr. Begolly at approximately 7:15 p.m.  Mr. Begolly was confined to an isolation cell on the mental health pod, and forced to sleep on a slat bed on the concrete floor.  Counsel was not permitted a contact visit and had to herself sit on the floor and converse with Mr. Begolly through a slit in the door.  Defense counsel quickly concluded that Mr. Begolly was not mentally ill or psychotic and was being subjected to this treatment at the behest of the Government to strengthen the case for detention.

38.  In the intervening week, the jail has refused to allow Mr. Begolly any visitors, including family members, and has refused to provide him with the dermatological medicine, Bencort, which he needs for a stress-related rash he gets on his ears.  Furthermore, the jail has refused to allow him to brush his teeth or take a shower, assuring that when he appears before this Court on January 13, 2011, he will look as crazy as possible.

II.   BASED UPON THE EVIDENCE ADDUCED AT THE DETENTION
HEARING, RELEASE ON HOME DETENTION WILL REASONABLY
ASSURE MR. BEGOLLY'S APPEARANCE AND THE SAFETY OF
ANY OTHER PERSON AND THE COMMUNITY

A.   Legal Standard

39.   Pretrial release should only be denied for "the
strongest of reasons." Truong Dinh Hung v. United States,
439 U.S. 1326, 1329 (1978) (citation omitted). Generally, a
court must release a defendant on bail on the least
restrictive condition or combination of conditions that will
reasonably assure the defendant's appearance when required
and the safety of the community. See 18 U.S.C. §
3142(c)(1)(B). Indeed, it is well established that when
Congress enacted the Bail Reform Act, it retained the
preference for the release of most defendants prior to trial.
See United States v. Byrd, 969 F.2d 106 , 109 (5th Cir.
1992)("There can be no doubt that this Act clearly favors
non-detention."). Accordingly, the provisions of the Bail
Reform Act should be narrowly construed in favor of release.
See, e.g., United States v. Singleton, 182 F.3d 7, 23 (D.C.
Cir. 1999); United States v. Hinote, 789 f.2d 1490, 1941
(11th Cir. 1986) (holding that it is required "that we

strictly construe provisions of the Bail Reform Act of
1984").

40. This court must review the magistrate judge's
detention order <u>de novo</u>. <u>See</u> 18 U.S.C. § 3145(b); <u>United
States v. Delker</u>, 757 F.2d 1390 (3d Cir. 1985). Further, this
Court's review does not require a <u>de novo</u> evidentiary
hearing, although the Court may receive additional proffers,
documents, or conduct evidentiary hearings. <u>See</u> <u>United States
v. Chagra</u>, 850 F. Supp. 354, 357 (W.D. Pa. 1994) (recognizing
that the court may incorporate the records of the proceedings
before the magistrate judge).

41. Before a pretrial detention is ordered, the Court
must  engage in a two-step analysis. First, the government
must prove (1) by a preponderance of the evidence that Mr.
Begolly is a serious risk of flight, or (2) by clear and
convincing evidence that he is a danger to the community. 18
U.S.C. §§ 3142(e)(f). Second, if the Court concludes that the
government has carried its burden, the government must then
prove 1) by clear and convincing evidence, that no condition

20

or combination of conditions will reasonably assure the safety of the community; or 2) by a preponderance of the evidence, that there is no condition or combination of conditions that will "reasonably assure" Mr. Begolly's presence at trial if released." <u>See</u> <u>United States v. Fortna</u>, 769 F.2d 243, 250 (5th Cir. 1985) ("[T]he standard is reasonably assure appearance, not 'guarantee' appearance, and detention can be ordered on this ground only if 'no condition or combination of conditions will reasonably assure the appearance.'); <u>See also</u>, <u>United States v. Suppa</u>, 799 F.2d 115, 119 (3d Cir. 1986) (even in rebuttable presumption cases, the burden of persuasion always remains with the government).

      B.   <u>The Government Failed to Prove by Clear and Convincing Evidence that Mr. Begolly is a Danger to the Community</u>

42.   "The facts...that no condition or combination of conditions will reasonably assure the safety of any other person and the community <u>shall be supported by clear and convincing evidence</u>." 18 U.S.C. § 3142(f). <u>Addington v. Texas</u>, 441 U.S. 418, 431-33(1979). The Government utterly

failed to meet that burden here.  It introduced **no evidence** of any previous acts of violence.  Moreover, its allegations regarding Mr. Begolly's conduct regarding the two agents are highly dubious.

43.  The Government concedes that the agents snuck up on Mr. Begolly, who has Asperger's syndrome, startling and frightened him, thus provoking him to scream.  They then further escalated the situation by jumping into the vehicle and wrestling with him.  Even assuming the agents suffered minor injuries during the incident, **which Mr. Begolly does not concede**, these injures are attributable to the conduct of the agents and do not evidence violent propensities on the part of Mr. Begolly, especially in light of his lack of history of violence.

44.  Moreover, in light of Agent Orsini's history of falsification of sworn documents and the lack of documentation of the alleged bites, as well as the presumption of innocense, the Court should not assume or presume that Mr. Begolly bit the agents.  See 18 U.S.C. § 18

22

U.S.C. § 3142(j)("nothing in this section shall be construed as modifying or limiting the presumption of innocence").

45.  Indeed, for this reason, the factor of "weight of the evidence," under 18 U.S.C. § 3142(g)(2) weighs in favor of release.  Here, although the Government has yet to produce either of the agents whom Mr. Begolly allegedly bit, or any reports authored by them, it appears that the government's evidence will consist of testimony by the agents that they noticed wounds to their hands after wrestling Mr. Begolly out of the car.  No corroborating photographs of the wounds were apparently taken, and the agents claim they first noticed the alleged wounds after exiting the car.  Further, Agent Orsini will apparently testify that after he snuck up on Mr. Begolly and threw open his car door, Mr. Begolly moved his hand to his right pocket where the agents allegedly later found a handgun.  Even putting aside Agent Orsini's documented extreme lack of credibility, it is far from clear that, on these facts, the Government will be able to establish the offense of either assault on a federal agent or 934(c) to the

satisfaction of a unanimous jury. Thus, the "weight of the evidence" factor weighs in favor of release.

46. The Government also sought to rely upon Mr. Begolly's possession of firearms. However, with the exception of its assertion that Mr. Begolly was carrying a firearm without being licensed, a misdemeanor in Pennsylvania, the Government has failed point to any other firearms offense committed by Mr. Begolly. See 18 Pa. C.S. § 6106(a)(2). In particular, the Government has failed to point to any illegality with respect to Mr. Begolly's purchase or possession of an AK-47.

47. In its Appeal, the Government also emphasizes evidence that Mr. Begolly allegedly carried firearms on his father's 80 acre farm in Clarion County. Such carriage of a firearm on private property is lawful in Pennsylvania. See 18 Pa. C. S. 6106 (Providing that a permit is not required to carry a firearm at one's "place of abode" or "fixed place of business"). Such lawful carriage of a firearm on a farm, in a rural setting, falls far short of establishing by clearing

24

and convincing evidence that there are **no** conditions of release that would reasonably assure the safety of any person or the community, the standard the Government must meet here.

48.   For the reasons set out above, the Government's vague allegations regarding Mr. Begolly's protected political speech are completely insufficient to establish that there are no reasonable conditions that would reasonably assure the safety of the community.  Although the Government apparently would like to have the power to jail individuals based upon political or "hate speech" with which it disagrees, no such authority is found in the Bail Reform Act, and such a procedure clearly runs afoul of the First, Fifth and Fourteenth Amendments.

49.   The Government has failed to provide this Court with any evidence of any specific, credible threat to any individual, much less with any corroborating evidence that Mr. Begolly intended to carry out such a threat.  The poem offered as Government's evidence 3, is just that a poem, and does not contain any specific nor credible threat against

anyone.   As the Supreme Court succinctly stated in <u>Watts v.</u>
<u>United States</u>, 394 U.S. 705, 708 (1969), a case involving an
alleged threat against President Lyndon Johnson made at anti-
war rally, "What is a threat must be distinguished from
constitutionally protected speech."   In that case, the
defendant stated his intention not to report for the draft,
and further stated that, "If they ever make me carry a rifle
the first man I want to get in my sights is L.B.J."   The
Supreme Court found the prosecution for threatening the
president violated the First Amendment, ruling that
"political hyperbole," even consisting of "vehement, caustic
and sometimes unpleasantly sharp attacks on government and
public officials," even if, "vituperative, abusive, and
inexact," is protected by the First Amendment and cannot form
the basis for a criminal prosecution.   <u>Watts</u>, 394 U.S. at
708.   As such, the poem is clearly political speech protected
by the First Amendment.   <u>See also</u>   <u>Virginia v. Black</u>, 538
U.S. 343, 365 (2003)(holding that statute treating cross
burning as prima facie evidence of intent to intimidate
rendered the Virginia cross burning statute unconstitutional
under the First Amendment, because it criminalized all cross

burnings regardless of whether the cross was burned to intimidate an individual or as an expression of political speech).  As the Supreme Court explained in <u>Black</u>, "the hallmark of the protection of free speech is to allow 'free trade in ideas – ***even ideas that the overwhelming majority of people might find distasteful or discomforting.*** [Citation omitted].  Thus, the First Amendment 'ordinarily' denies a State 'the power to prohibit dissemination of social, economic and political doctrine which a vast majority of it citizens believes to be false and fraught with evil consequences." <u>Black</u>, 538 U.S. at  358.

50.  For this reason, individuals may not be criminally prosecuted for espousing such ideas, *a fortiori*, they may not be detained without trial for doing so, which is precisely what the Government seeks to do here.

51.  Defense counsel further notes that in <u>United States v. Donald Lee Fenton</u>, Cr. No. 98-1J (Smith, J.), a high profile case in which the defendant, a mentally ill man, was indicted for threatening former Congressman John P. Murtha

27

and an aide, the defendant was released on bond. Similarly, in <u>United States v. Kris Weinschenker</u>, Cr. No. 08-151 (Ambrose, J.), the defendant was released on bond despite allegations that he threatened Supreme Court Justice John Roberts.

                C.   <u>The Government Failed to Establish a Serious Risk of Flight</u>

52. The government failed to meet its burden to prove that there are **no** conditions that would reasonably assure Mr. Begolly's appearance in Court. A mere theoretical opportunity for flight is not sufficient grounds for pretrial detention. See <u>United States v. Himler</u>, 797 F.2d 156, 162 (3d Cir. 1986) (finding that possession of one false form of identification is not enough by itself to justify pretrial detention in the absence of evidence that defendant actually intended to flee from prosecution).

53. Relevant factors that support a serious risk finding include the use of a number of aliases, unstable residential ties to a community, efforts to avoid arrest, or

28

hidden assets.  <u>United States v. Friedman</u>, 837 F.2d 48, 49 (2d Cir. 1988; <u>see also</u>, <u>United States v. Cole</u>, 715 F.Supp. 677, 679 (E.D. Pa. 1988) (defendants posed serious flight risk because they held and used foreign passports and told undercover agents they would flee if arrested).

54.  Here, Mr. Begolly is a twenty-one year-old man, who is financially dependent on his parents.  He does not drive and does not have a driver's license.  HT: 76.  <u>See</u> 18 U.S.C. § 3142(b).  He has a current passport, but it has been seized by the Government.  Moreover, there was testimony that he originally obtained the passport to attend a family wedding in Poland.  HT: 43-44.  Pretrial Services's recommendation was that he be released on electronic monitoring to his father's 80 acre farm.  Accordingly the Government has failed to establish a serious risk of flight.

D.   <u>Mr. Begolly has Rebutted the Presumption</u>

55.  Even in cases that fall in categories where there is a presumption that no condition or combination of conditions will reasonably assure the defendant's appearance

or the safety of any other person and the community, the defendant may rebut such presumption and a court may order him released pre-trial. <u>See</u> 18 U.S.C. § 3142(e), (f). This presumption creates a burden of production upon a defendant, not a burden of persuasion. The defendant only has to present "'some credible evidence that he will appear and will not pose a threat to the community.'" <u>United States v. Carbone</u>, 793 F.2d 559, 560 (3d Cir. 1986). Mr. Begolly meets this "relatively light" burden especially where the government failed to meet its burden to demonstrate by clear and convincing evidence that there are absolutely <u>no conditions</u> or combination of conditions that would reasonably assure his appearance as required and the safety of any person and the community. <u>See United States v. Chagra</u>, 850 F. Supp. 354, 357 (W.D. Pa. 1994).

56. Moreover, the only reason the rebuttable presumption applies in this case is because of the Government's gratuitous inclusion of the charge of violating 18 U.S.C. § 924(c), possession of a firearm **in furtherance of** a crime of violence. At the preliminary hearing, when asked

by the Magistrate Judge to explain the basis for the § 924(c) charge, the Government quickly backed away from the idea that Mr. Begolly possessed the firearm in furtherance of biting the agents, instead asserting that he was going to draw the firearm on the agents.  However, the testimony was that Mr. Begolly reached toward the pocket where the firearm was, only after the agents snuck on him and startled him by throwing open the doors of his car.  Thus, it appears that the evidence in support of an intent to assault the agents Ia. thin indeed.  Rather, it appears that the agents deliberately provoked a man they knew to suffer from Asperger's syndrome into taking action, which they could then charge him with. For the Government to then capitalize on these events to deny this young man bond while he awaits trial on these questionable charges constitutes a grave injustice.


                              CONCLUSION

     WHEREFORE, Mr. Emerson Begolly respectfully moves this Honorable Court, to AFFIRM the Magistrate Judge's Order of

Release and MODIFY it to permit Mr. Begolly to be released on

home detention to his father's home.

                          Respectfully submitted,


                          s/ Markéta Sims
                          Markéta Sims
                          Assistant Federal Public Defender
                          Attorney Pa. I.D. No. 66325